UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                                    :
UNITED STATES OF AMERICA,          :          CASE NO. 1:07-CR-68
                                                    :
            Plaintiff,                         :
                                                    :
vs.                                               :          OPINION & ORDER
                                                    :          [Resolving Doc. No. 53]
TEKORA MADDEN,                         :
                                                    :
            Defendant.                      :
                                                    :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

        With this Opinion and Order, the Court decides whether to grant the motion of Defendant

Tekora Madden ("Madden") to suppress evidence seized and statements obtained by the police

during and after a January 11, 2007 roadside stop of a minivan driven by Madden.

        In its determination, the Court considers constitutional issues arising from the police's stop

of Madden's vehicle, their seizure of Madden without a warrant, and their eventual search of her

home in furtherance of an on-going investigation into a suspected conspiracy to distribute and

possess phencyclidine ("PCP").  In this action, Madden's co-defendants include Carl Henderson

("Henderson"), Gerald Taylor ("Taylor"), and Maurion Lewis ("Lewis"), each of whom have filed

motions to suppress that the Court separately considers.

        For the reasons presented below, the Court **DENIES**, in part, and **GRANTS**, in part,

Madden's motion to suppress.

I.  Background

-1-

Case No. 1:07-CR-68
Gwin, J.

On January 11, 2007, United States Drug Enforcement Agency ("DEA") Special Agent Lee Lucas ("Lucas") directed an on-going undercover investigation of a suspected PCP distribution ring involving individuals in Los Angeles and Cleveland.  Trial Tr. at 9 (Mar. 16, 2007).  The PCP conspirators allegedly included Madden, Henderson, Lewis, and Taylor.  *Id.*  With respect to the January 11, 2007 events involving Defendant Madden, Lucas participated in surveillance and interrogation efforts as part of an undercover investigation team that included, among others, Cleveland Police Department's Captain Brian Heffernan ("Heffernan") and Detective Timothy Clark ("Clark").  *Id.* at 15, 18.

The undercover team pursued tandem investigations on January 11, 2007.  Initially, Lucas and Heffernan participated in a roving surveillance of a green minivan driven by Madden with Henderson as her passenger.  *Id.* at 13-20.  Once the police stopped the Madden-Henderson minivan, Lucas left the location to participate in a roving surveillance of a silver van occupied by Lewis and Taylor.  *See, e.g., id.* at 19.  Lucas maintained radio contact with Heffernan and Clark after Lucas left the Madden-Henderson roadside stop.  *Id.*

With regard to the Madden-Henderson surveillance, at around midday on January 11, 2007, police officers associated with Lucas's undercover team informed him that Madden, driving a green minivan, had just picked-up Henderson at the Extended Stay America motel in Brooklyn, Ohio.  *Id.* at 14.  Lucas drove to the motel and recognized Madden as the driver and Henderson as the passenger of the minivan.  *Id.*  Lucas followed Madden and Henderson as the vehicle, driven by Madden, left the motel parking lot.  *Id.* at 14-18.  Eventually, Captain Heffernan, driving an unmarked police car, joined the Madden-Henderson surveillance.  *Id.* at 16. Over police radios and handsets, Lucas and Heffernan worked with marked police patrol units to stop the minivan.  *Id.* at

-2-

Case No. 1:07-CR-68
Gwin, J.

15.  The purpose of the stop was to arrest Henderson on an outstanding warrant.  *See, e.g.*, *id.* at 17,
50-51.  Once the marked police patrol units stopped the minivan, Lucas left the Madden-Henderson
surveillance to participate in the Lewis-Taylor surveillance back at the Extended Stay America
motel.  *Id.* at 19.

Upon stopping the Madden-Henderson minivan, the police noticed that the vehicle's interior
smelled of marijuana and they questioned Henderson and Madden as to Henderson's identity.  *See,
e.g.*, *id.* at 19.  Lucas testified that, when asked to identify himself at the roadside stop, Henderson
presented the police with an identification card showing his name as "Keisoun Moon."[1]  *See, e.g.*,
*id.* at 54-55.  Madden identified Henderson as her husband and said his name was "Shawn."  *See,
e.g.*, *id.* at 19, 98, 101.  Special Agent Lucas testified that Henderson used the name "Shawn" as a
nickname.  *Id.* at 10, 55, 223.  When questioned about her passenger's full identity, Madden refused
to provide Henderson's last name.  *See, e.g.*, *id.* at 19, 299-300.

Heffernan was on the scene and, based on information from Lucas, knew Madden's
passenger to be "Carl Henderson."  *See, e.g.*, *id.* at 14, 19, 21, 46-48, 95, 100, 109, 222; Trial Tr. at
432-33 (Mar. 19, 2007).  Detective Clark, based on his personal knowledge, identified Madden's
"Shawn" and Henderson's "Keisoun Moon" as "Carl Henderson." Trial Tr. at 109 (Mar. 16, 2007);
Trial Tr. at 393-94 (Mar. 19, 2007).  In short order, the police arrested Henderson and transported
him to Cleveland's Central Prison Unit.  *See, e.g.*, Trial Tr. at 104, 106, 306 (Mar. 16, 2007).

Separately, Captain Heffernan ordered Madden out of the minivan and placed her in the back
seat of his undercover police car.  *Id.* at 98-99.  Heffernan and Clark retrieved Madden's purse and

---

[1] Henderson's January 11, 2007 booking card from the Cleveland Police Department records his name as
"Keisoun Walker."  *See, e.g.,* Gov't Exh. 11; Trial Tr. at 106 (Mar. 16, 2007).

-3-

Case No. 1:07-CR-68
Gwin, J.

day-planner from the minivan and counted approximately $17,000 in cash and checks that the officers said smelled like marijuana.  *See, e.g.*, *id.* at 99, 301.

For approximately the next two hours, Madden sat in the back seat of the police car while Heffernan and Clark questioned her about the approximately $17,000 and her connection with Henderson.  *Id.* at 99-103.  Upon orders from Lucas, Madden "was not free to go" from the officers' custody from the time of her roadside stop or thereafter.  *Id.* at 60-61.

During this time, Heffernan and Clark assisted the other police officers in searching the green minivan.  *Id.* at 300-06.  The officers found approximately $17,000 in Madden's purse and day-planner.  *Id.* at 99-100.  The officers found no drugs or weapons in the minivan or on Madden's person.  *See, e.g.*, *id.* at 100, 116, 216, 299-300.

Upon instruction by Lucas, Heffernan and Clark continued to detain and question Madden in the police car.  *Id.* at 99-103.  Heffernan confiscated Madden's cell phone.  *Id.* at 102.  Heffernan and Clark phoned Lucas as they received information from Madden.  *See, e.g.*, *id.* at 131, 305-06. In turn, Lucas periodically contacted the prosecuting attorney to discuss next steps in the on-going PCP investigation.  *See, e.g.*, *id.* at 29, 40, 183, 280.

At around 4:00 p.m., the police towed the green minivan away.  *See, e.g.*, *id.* at 19-20. Heffernan and Clark then transported Madden to the Fourth District Station.  *See, e.g.*, *id.* at 53, 55-56, 103-04, 304-07.  Here, Clark claims to have advised Madden of her *Miranda* rights at some point during the afternoon, but admits that neither Heffernan nor Lucas witnessed him do so.[2/]  *See, e.g.*, *id.* at 54, 403-04, 411-12, 414.  At the suppression hearing, Captain Heffernan testified that he did

---

[2/] Special Agent Lucas testified that he did not know whether Madden had been advised of her *Miranda* rights while she sat in the police car.  *See, e.g.*, Trial Tr. at 54, 55 (Mar. 16, 2007).  Lucas testified that he advised Madden of her *Miranda* rights after she arrived at the Justice Center in the evening of January 11, 2007.  *See, e.g.*, *id.* at 25, 57, 183-84.

Case No. 1:07-CR-68
Gwin, J.

not Mirandize Madden.  *Id.* at 324.  When asked if his partner, Detective Clark, read Madden her

*Miranda* rights, Captain Heffernan responded, "[n]ot that I'm aware of."  *Id.*  Madden testified that

Clark "[n]ever did" Mirandize her.  Trial Tr. at 465 (Mar. 19, 2007).  After approximately thirty

minutes in the Station's parking lot, Heffernan and Clark transported Madden to the Cleveland

Justice Center.  Trial Tr. at 104-06, 304-07 (Mar. 16, 2007).

Once at the Justice Center, police escorted Madden into an interview room.  *Id.* at 23-25,

105-06, 183-84, 306-07, 313.  Here, Special Agent Lucas advised Madden of her *Miranda* rights.

*Id.* at 25, 55, 57, 183-84.  The officers continued questioning Madden.  *Id.*  Eventually, Madden

signed two consent waivers allowing the undercover officers to search her residence at 2350 Wynde

Tree Drive, Seven Hills, Ohio ("Wynde Tree Residence").  *See, e.g.*, *id.* at 28-30.  The Government

says Madden voluntarily consented to the search.  [Doc. 75.]  Madden contends that the police

coerced her consent. [Doc. 53.]

Later that night, the police searched Madden's home and found approximately $40,000 in

cash, two bricks of marijuana, and one bottle of Listerine apparently containing PCP.  Trial Tr. at

34-35, 40-41, 183-85, 187, 190 (Mar. 16, 2007).  Based on this discovery, Lucas decided to

"formally" arrest Madden and took her into custody.  *See, e.g., id.* at 35.  The next day, on January

12, 2007, Magistrate Judge Kenneth S. McHargh issued an arrest warrant for Madden.  [Doc. 2.]

On February 7, 2007, the Government filed an indictment that charged Madden with one

count of conspiracy to distribute and possess PCP, one charge of possession with the intent to

distribute PCP, and related forfeiture charges.  [Doc. 15-3.]  On February 28, 2007, the Government

filed a superceding indictment to add a one count of possession with the intent to distribute an

additional 100 grams of a PCP substance, i.e., the contents of the Listerine bottle found at the Wynde

Case No. 1:07-CR-68
Gwin, J.

Tree Residence.  [Doc. 59.]  Madden pleaded "Not Guilty" to the Government's charges.  [Doc. 66.]

On February 26, 2007, Madden filed a motion to suppress all evidence obtained during the January 11, 2007, seizure, questioning, and search of the Wynde Tree Residence.  [Doc. 53.]  The Government filed its opposition on March 14, 2007.  [Doc. 75.]

On March 16 and 19, 2007, the Court conducted a hearing, during which it received evidence and heard argument related to Madden's suppression request.  [Docs. 81, 86.]  This Opinion and Order follow from the facts and evidence presented by the parties at that suppression hearing.

## II.  Legal Standard and Analysis

In her pending motion, Madden asks the Court to suppress evidence seized during the roadside stop, her arrest, and the search of her home.  For the reasons discussed below, the Court denies Madden's motion as it relates to evidence seized from the green minivan.  The Court grants Madden's suppression motion as it relates to evidence obtained as the result of her arrest.

### A. The Roadside Stop of the Green Minivan

Madden says that the police impermissibly stopped the green minivan to arrest Henderson. At the suppression hearing, Special Agent Lucas testified that he ordered Captain Heffernan to work with marked patrol units of the Cleveland Police Department to stop the minivan and arrest Henderson on an outstanding warrant.  Lucas also said that, during his January 11, 2007 surveillance of Madden and Henderson, Lucas suspected that Henderson and Madden had completed or were pursuing a PCP-related drug transaction.

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government. U.S. CONST. amend. IV.  These protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.  *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *United States v. Cortez*, 449

-6-

Case No. 1:07-CR-68
Gwin, J.

U.S. 411, 417 (1981); *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Because the "balance between the public interest and the individual's right to personal security," *United States v. Brignoni-Ponce*, 422, U.S. 873, 878 (1975), tilts in favor of a standard of less than probable cause in such cases, an officer satisfies the Fourth Amendment's requirements if he supports his action by reasonable suspicion to believe that criminal activity "may be afoot," *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30).  *See also Cortez*, 449 U.S. at 417 (noting that "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity").  *And see Arvizu*, 534 U.S. at 277 (allowing as objective basis for reasonable suspicion an officer's "observations, registration check, and his experience as a border patrol agent" to stop a suspected smuggler).

A court makes a "reasonable suspicion" determination by looking at the "totality of the circumstances" of each case to decide whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.  *See, e.g.*, *Cortez*, 449 U.S. at 417-18; *Arvizu*, 534 U.S. at 273.  In doing so, a court allows officers to draw from their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *Cortez*, 449 U.S. at 418.  Although an officer's reliance on a mere "hunch" insufficiently justifies a stop, *Terry*, 392 U.S. at 27, "the likelihood of criminal activity need not rise to the level of probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard," *Arvizu*, 534 U.S. at 274 (citing *Sokolow*, 490 U.S. at 7).

"Reasonable suspicion" is a "somewhat abstract" concept.  *Ornelas v. United States*, 517 U.S. 690, 696 (1975) (noting that principle of reasonable suspicion is not a "finely-tuned standard"); *Cortez*, 449 U.S. at 417 (stating that the cause "sufficient to authorize police to stop a person" is an

Case No. 1:07-CR-68
Gwin, J.

"elusive concept").  However, the Supreme Court has "deliberately avoided reducing it to a neat set of legal rules." *Arvizu*, 534 U.S. at 274 (internal quotation and citations omitted).  In *Sokolow*, for example, the Court refused to distinguish between probabilistic evidence and evidence of continuing criminal behavior, because doing so "created unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment." 490 U.S. at 7-8.

Having considered the totality of the circumstances and giving due weight to the factual inferences drawn by the law officers who testified at the suppression hearing, the Court finds that the officers had reason to stop the green minivan to arrest Henderson on his outstanding arrest warrant.  Further, the officers had reasonable suspicion to believe that Henderson, Madden's passenger in the van, engaged – or was about to engage – in illegal activity on January 11, 2007. As a result, the officers had sufficient grounds to effect a *Terry* stop.  For example, Lucas reasonably inferred from information relayed to him, his observations, and his experience as a DEA agent that Madden picked-up Henderson from the Extended Stay America motel and drove an indirect route to Lee Road to engage in a drug transaction.

Lucas's knowledge further supported a common-sense inference that Henderson's presence at the Extended Stay America motel related to the presence of other known drug dealers from California.  In arriving at their reasonable suspicion that criminal conduct was afoot, the officers could find it unusual that Henderson would overnight at the motel, rather than with Madden, his wife, at their nearby home.  The officers could infer that Madden drove the van for Henderson because Henderson had an outstanding warrant for his arrest.  Finally, Special Agent Lucas recognized Madden and suspected her role in an immediate drug transaction.

Madden argues that the Court must rule in her favor because the facts suggest nothing more

-8-

Case No. 1:07-CR-68
Gwin, J.

than a couple traveling in a minivan. "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277 (citing *Ill. v. Wardlow*, 528 U.S. 119, 125 (2000)). Each of the factors considered by Lucas may have an innocent explanation. But, taken together, the officers suspicions regarding Henderson and Madden form enough of a particularized and objective basis for the police to stop the minivan, making the stop "reasonable" within the context of the Fourth Amendment.

Having found that the officers properly stopped the green minivan, the Court also finds that the police properly confiscated the approximately $17,000 from the vehicle incident to Henderson's lawful arrest. *See, e.g.*, *United States v. Robinson*, 414 U.S. 218, 224 (1973) (noting that "[i]t is well-settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment"). During a lawful arrest, the police may permissibly search not only the person of the arrestee, but also "the area within the control of the arrestee." *Id.*

That Madden's purse and day-planner contained the approximately $17,000 does not taint the seizure as it relates to Henderson's arrest. Madden's purse and day-planner qualify as searchable containers within "'the area into which an arrestee might reach in order to grab a weapon or evidentiary [item].'" *N.Y. v. Belton*, 453 U.S. 454, 460 (citing *Chimel v. Cal.*, 395 U.S. 752, 763 (1969)). The large amount of the money and fact that it smelled of marijuana has evidentiary value to the Government's drug conspiracy charges against Madden and Henderson. Thus, the Court will not suppress the evidence seized by the officers from the green minivan.

### B. Madden's Arrest Without Probable Cause

As discussed above, the undercover officers need only have a reasonable suspicion of illicit acts to briefly detain an individual to investigate any criminal activity that might be "afoot." *Terry*,

Case No. 1:07-CR-68
Gwin, J.

392 U.S. at 30.  But, when that detention rises to the level of a full-fledged arrest, the Fourth

Amendment requires that the undercover officers support an arrest with probable cause.  *See, e.g.*,

*Dunaway v. N.Y.*, 442 U.S. 200, 212-14 (1979).  An arrest, or "seizure," occurs when police detain

an individual under circumstances where a reasonable person would not feel free to leave.  *See*

*United States v. Obasa*, 15 F.3d 603, 606 (6th Cir. 1994).  "Probable cause" consists of knowledge,

facts, and circumstances that "are sufficient to warrant a prudent person, or one of reasonable

caution, [to believe] in the circumstances shown, that the suspect has committed, is committing, or

is about to commit an offense."  *Mich. v. DiFillippo*, 443 U.S. 31, 37 (1979).

### 1. Madden's Seizure

The Government does not deny that the police detained Madden on January 11, 2007.  *See,*

*e.g.*, Trial Tr. at 63-64 (Mar. 16, 2007).  However, the Government says that the undercover officers'

police car detention of Madden at the roadside stop and their transportation of her to the Fourth

District Station and Justice Center represent merely investigatory detention and not a full-fledged

arrest.  *See, e.g.*, *id.*  *See also* Doc. 75.  The Government argues that the undercover officers

possessed the requisite "reasonable suspicion" that criminal activity "was afoot," which permitted

them to detain Madden in Captain Heffernan's police car – a detention that lasted at least four hours

and involved her custodial transport to two police stations.  The Government also argues that

Madden was "arrestable" for obstructing justice "at any time" during her detention, although no

facts or testimony suggests that such a justification actually motivated the undercover officers on

January 11, 2007.  The Government concludes that, because the undercover officers merely

"detained" Madden  who was otherwise "arrestable" anyway, the police did not violate Madden's

Fourth Amendment rights against unreasonable seizure.

-10-

Case No. 1:07-CR-68
Gwin, J.

Responding, Madden argues that her detention in Heffernan's police car and subsequent transportation to the Fourth District Station and the Justice Center amounted to an illegal arrest without probable cause.

Given the facts of the case and considering the relevant Fourth Amendment jurisprudence, Madden has the better argument.

In determining whether a "detention" or "seizure" amounts to an arrest requiring probable cause, a court considers factors such as "the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force."  *United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003) (quoting *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991)).  In particular, transportation to a police station for questioning, *see Hayes v. Florida*, 470 U.S. 811, 815-16 (1985); *Dunaway v. New York*, 442 U.S. 200, 212 (1989), or to the back of a police vehicle, *see Richardson*, 949 F.2d at 857, can transform an investigatory stop based on reasonable suspicion into an arrest requiring probable cause.

On the facts presented, the police arrested Madden when, upon orders from Special Agent Lucas, she was "not free to go" from Captain Heffernan's police car at the scene of the roadside stop.  At the suppression hearing, Special Agent Lucas testified that Madden "was not free to go from the time that [the police] stopped her" in the green minivan.  *See* Trial Tr. at 61 (Mar. 16, 2007).  On the stand, Captain Heffernan corroborated Lucas's testimony when he told the Court that, upon Lucas's orders, Heffernan kept Madden in the back seat of his police car, apparently questioned her without providing her *Miranda* rights, and confiscated her cell phone.  *Id.* at 58-59.

-11-

Case No. 1:07-CR-68
Gwin, J.

Keeping Madden in the back of Heffernan's police car from which she was not free to leave represents the *sine qua non* of a "significant restraint on the detainee's freedom of movement involving physical confinement . . . preventing [Madden] from leaving police custody." *Lopez-Arias*, 344 F.3d at 627. Through their testimony, Special Agent Lucas and Captain Heffernan admit that Madden was "not free to go" once she was in the back seat of Heffernan's police car. Madden's lack of choice in the matter demonstrates that the officers "seized" her at the scene of the roadside stop. *See Richardson*, 949 F.2d at 857; *Obasa*, 15 F.3d at 606. Thus, the undercover officers subjected Madden to more than a mere investigatory detention. They arrested her.

Heffernan's and Clark's transport of Madden to the Fourth District Station and the Justice Center support this finding. Starting at some time before 2:00 p.m. until after 4:00 p.m., Heffernan and Clark kept Madden in Heffernan's police car. At some point after 4:00 p.m., the officers transported Madden from the scene of the roadside stop to the parking lot of the Fourth District Station. Here, Madden sat in Heffernan's police car for approximately thirty minutes. She was "not free to go." In the parking lot, Heffernan and Clark continued to act on orders from Lucas to detain Madden and question her about her relationship with Henderson. Thereafter, Heffernan and Clark transported Madden to the Justice Center in downtown Cleveland. Once at the Justice Center, the police escorted Madden to an interview room where Special Agent Lucas, Detective Clark and other officers questioned her about the purported PCP ring. Madden's transportation to the Fourth District Station and, ultimately, the Justice Center removes any doubt the undercover officers had arrested her prior to her arrival downtown. *See Hayes*, 470 U.S. at 815-16; *Dunaway*, 442 U.S. at 212.

Madden's arrest presents facts similar to those considered by the *Dunaway* Court. In *Dunaway*, an investigating police officer learned that an informant had supplied a possible lead

-12-

Case No. 1:07-CR-68
Gwin, J.

implicating the petitioner in a crime. *See* 422 U.S. at 203. The investigating officer questioned the

supposed source of the lead, but learned nothing that supplied "enough information to get a warrant"

for the petitioner's arrest. *Id.* Regardless, the officer ordered other detectives to "pick up" the

petitioner and "bring him in." *Id.* Three detectives located the petitioner, took him into custody,

and "although he was not told he was under arrest, he would have been physically restrained if he

had attempted to leave." *Id.* The detectives drove the petitioner to police headquarters in a police

car and placed him in an interrogation room, where officers gave him his *Miranda* rights and began

questioning him. *Id.* The Court found that "[t]here can be little doubt that petitioner was 'seized'

in the Fourth Amendment sense when he was taken involuntarily to the police station." *Id.* at 207.

In its holding, the *Dunaway* Court rejected the state's argument that "the seizure of petitioner

did not amount to an arrest and therefore was permissible under the Fourth Amendment because the

police had a 'reasonable suspicion' that petitioner possessed 'intimate knowledge about a serious

and unsolved crime.'" *Id.* The *Dunaway* Court contrasted the "brief and narrowly circumscribed

intrusions involved in" *Terry*-type "investigative detentions" and "traditional arrests:"

> Petitioner was not questioned briefly where he was found. Instead, he was taken
> from a neighbor's home to a police car, transported to a police station, and placed in
> an interrogation room. He was never informed that he was "free to go;" indeed, he
> would have been physically restrained if he had refused to accompany the officers
> or had tried to escape their custody. The application of the Fourth Amendment's
> requirement of probable cause does not depend on whether an intrusion of this
> magnitude is termed an "arrest" under state law. The mere facts that petitioner was
> not told he was under arrest, was not "booked," and would not have an arrest record
> if the interrogation had proved fruitless . . . obviously do not make petitioner's
> seizure even roughly analogous to the narrowly defined intrusions involved in *Terry*
> and its progeny. Indeed, any "exception" that could cover a seizure as intrusive as
> that in this case would threaten to swallow the general rule that Fourth Amendment
> seizures are "reasonable" only if based on probable cause.

*Id.* at 212-13.

Case No. 1:07-CR-68
Gwin, J.

Thus, like the investigating officers in *Dunaway*, Lucas, Heffernan, and Clark subjected Madden to much more than a "brief investigatory detention." Captain Heffernan did not question Madden briefly where he found her, i.e., in the driver's seat of the green minivan. Instead, Heffernan ordered Madden from the minivan and placed her in the back seat of his police car where he began his interrogation of Madden. The police confiscated Madden's cell phone, towed her vehicle and, apparently, did not offer to take her home. Over the course of many hours, Heffernan and Clark retained Madden in custody and questioned her about Henderson. The officers relayed this information to Special Agent Lucas who, in turn, communicated regularly with the prosecutor about the on-going PCP investigation. From the time of the roadside stop until her arrival at the Justice Center, Special Agent Lucas ordered Heffernan and Clark that Madden "was not free to go." Thus, like the petitioner's arrest in *Dunaway*, Madden's seizure was not "even roughly analogous to the narrowly defined intrusions involved in *Terry*." *Dunaway*, 422 U.S. at 213. As a result, for the officers' arrest of Madden to meet the Fourth Amendment's requirements, the Government must support it with probable cause.

### 2.  The Officers' Lack of Probable Cause

In an attempt to establish probable cause, the Government says that Madden was "arrestable" for "a State drug violation, "historical conspiracy," "obstruction and for aiding and abetting." [Docs. 103, 110.] As support for its "arrestable" justification, the Government relies on an excerpted portion of Cleveland's traffic code and *United States v. Dede*, 83 Fed. Appx. 732 (6th Cir. 2003), an unpublished opinion of the Sixth Circuit. The Government's attempted justification creates a tortured path of legal analysis and, ultimately, fails. The undercover officers did not have probable cause to arrest Madden at the roadside stop.

-14-

Case No. 1:07-CR-68
Gwin, J.

First, the record does not reflect evidence indicating that Madden violated any cognizable

Ohio drug laws. Madden did not possess contraband at the roadside stop; nor did the officers find

any drugs in the green minivan. *See* Trial Tr. at 116-17 (Mar. 16, 2007). At the suppression

hearing, Captain Heffernan attempted to equate the smell of marijuana emanating from the money

in Madden's purse with criminality. *Id.* at 117. However, absent any other proof by the

Government, the Court agrees with defense counsel that merely having the smell of marijuana in

one's vehicle without other evidence of the contraband itself does not support probable cause that

Madden committed, was committing, or was about to commit an offense. *See Difillippo*, 443 U.S.

at 37.

Second, the Government provides no specific evidence of Madden's participation in a

"historical conspiracy." A conspiracy requires an agreement to violate the law, knowledge and

intent to join the conspiracy, and participation in the conspiracy. *See* 21 U.S.C. § 846. Mere

association of individuals with one another does not create the inference of conspiracy. *See United

States v. Lopez-Medina*, 461 F.3d 724, 742 (6th Cir. 2006) (citation omitted). Crediting the

testimony of the Government's witnesses, the Court finds that the undercover officers may have

suspected Madden's involvement in the purported PCP ring. However, none of the undercover

officers testified to any particularized knowledge that Madden had the intent to distribute PCP with

Henderson or anyone else. Nor did the Government's witnesses testify that Madden undertook any

overt act to further her supposed intention to conspire to distribute PCP.

Instead, the undercover officers testified to Madden's rather uneventful association with

Henderson on January 11, 2007. Madden retrieved Henderson from a motel near the couple's home.

The pair drove in a green minivan on the interstate. They exited the interstate. They stopped at a

Case No. 1:07-CR-68
Gwin, J.

store.  They bought water.  At one point, Madden stopped the minivan and interacted with a passer-

by.  The one arguably interesting fact relating to the couple's trip was that the minivan contained

Madden's purse and day-planner, which held large sums of cash that smelled of marijuana.

However, as stated above, the minivan did not contain the original source of the smell.  These

circumstances may provide limited support to suspect Madden as an accomplice to Henderson in

an indeterminate crime, but they do not create probable cause of her involvement in a "historical

conspiracy."

Third, the Government says the police detained Madden as "arrestable" for a variety of

purported violations.  Originally, the Government argued that Madden was "arrestable" "for

obstruction and for aiding and abetting Henderson in the presentation of a false identification[,] See

Cleveland, Ohio Codified Ordinances No. 435.04" and for aiding and assisting Henderson's

providing the police with false information about his identity during the roadside stop.  *See* Doc. 103

at 4.  In a subsequent filing, the Government belatedly claims Madden was "arrestable" for making

a false statement or, alternatively, for obstruction of justice.  *See* Doc. 110.

The basis of the Government's claims seems to be Madden's admission at the roadside stop

that Henderson was her husband, to whom she referred as "Shawn,"but that she did not know his

last name.[3/]

---

[3/] At the suppression hearing, Captain Heffernan described his conversation with Madden at the roadside stop:

Q.    Before you asked her to get out, did you also ask her about the identity of the passenger?

A.    Yes.  I asked what his name was.

Q.    And what was her response?

A.    Shawn.  And she said it was her husband, but they really weren't together.

(continued...)

Case No. 1:07-CR-68
Gwin, J.

Given the impossibility of Madden's lack of knowledge of Henderson's name, the Court interprets her statement as a refusal to give Henderson's surname. Stated otherwise, the complete absurdity of a wife not knowing her husband's last name suggests that Madden did not intend to mislead anyone; instead, she intended to deny assistance to the police. This refusal did not impede Henderson's arrest. Lucas, Heffernan, and Clark knew that Madden's passenger "Shawn" was "Carl Henderson." Thus, while the Government asserts that the officers justifiably seized Madden as "arrestable" for violating Cleveland's traffic code, the Court does not find this justification constitutionally permissible.

"The scope of the detention must be carefully tailored to its underlying justification." *Fla. v. Royer*, 460 U.S. 491, 500 (1983). Further, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* Finally, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975); *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

Here, the undercover officers did not appropriately tailor the scope of Madden's detention to her supposed underlying crime. The Court cannot accept the Government's contention that probable cause existed to arrest Madden for refusing to provide Henderson's surname. As a

---

[3]/(...continued)
Q.      Did you ask her to further identify him in any way, shape, or form?

A.      Yes.  I asked what his last name was.

Q.      What did she tell you?

A.      She said she didn't know.  They really -- even though they were married, they really hadn't been together.

Trial Tr. at  299 (Mar. 16, 2007).

-17-

Case No. 1:07-CR-68
Gwin, J.

practical matter, the police knew Henderson's surname long before Madden refused to provide it.

Special Agent Lucas recognized Madden's passenger as "Carl Henderson;" Detective Clark

identified Madden's "Shawn" as "Carl Henderson." Accordingly, the officers knew at the time of

the roadside stop that Henderson presented false identification. Madden's refusal to give

Henderson's surname gave no support for any crime that Henderson committed.

The Government next attempts to argue that Madden was "arrestable" for "aiding and

abetting" Henderson's violation of Cleveland's Codified Ordinance No. 435.04. *See* Doc. 103. The

Government specifically cites the prohibition that "[n]o person shall (a) Display, or cause to be

displayed, or possess any identification card . . . knowing the same to be fictitious; . . . (c) Display

or represent as one's own, any identification card . . . not issued to the person so displaying the

same." *Id.* The Court notes that Cleveland's municipal code does not define "aiding and abetting."

However, at the State-level, Ohio courts indicate that "[t]o support a conviction for complicity by

aiding and abetting pursuant to [Ohio Revised Code §] 2923.03(A)(2), the evidence must show that

the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in

the commission of the crime, and that the defendant shared the criminal intent of the principal. Such

intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 754 N.E.2d

796 (Ohio 2001).

Understanding the Government's attempted argument, the Court notes that this "aiding and

abetting" complicity does not reach an individual's provision of false or misleading statements as

to the identity of others. Instead, Ohio relegates an individual's affirmative duty to provide police

with limited information about one's self, not another. Specifically, Section 2921.29(A) of Ohio's

Revised Code provides that:

-18-

Case No. 1:07-CR-68
Gwin, J.

> (A)  No person who is in a public place shall refuse to disclose the person's name, address, or date of birth, when requested by a law enforcement officer who reasonably suspects either of the following:
>
>> (1) The person is committing, has committed, or is about to commit a criminal offense.
>>
>> (2) The person witnessed any of the following:
>>
>>> (a) An offense of violence that would constitute a felony under the laws of this state;
>>>
>>> (b) A felony offense that causes or results in, or creates a substantial risk of, serious physical harm to another person or to property;
>>>
>>> (c) Any attempt or conspiracy to commit, or complicity in committing, any offense identified in division (A)(2)(a) or (b) of this section;
>>>
>>> (d) Any conduct reasonably indicating that any offense identified in division (A)(2)(a) or (b) of this section or any attempt, conspiracy, or complicity described in division (A)(2)(c) of this section has been, is being, or is about to be committed.

OHIO REV. CODE ANN. § 2921.29(A).

Thus, at the roadside stop, the law required Madden to identify herself, but not Henderson:

> Nothing in this section requires a person to answer any questions *beyond that person's name, address, or date of birth. Nothing in this section authorizes a law enforcement officer to arrest a person for not providing any information beyond that person's name, address, or date of birth* or for refusing to describe the offense observed.

OHIO REV. CODE ANN. § 2921.29(C) (emphasis added).

In its pleadings, the Government offers the alternative argument that Madden was "arrestable" for identifying her passenger as "Shawn." *See* Doc. 110. Once again, it is nowhere clear how Madden's refusal could obstruct the police's investigation. As stated above, Special

-19-

Case No. 1:07-CR-68
Gwin, J.

Agent Lucas and other undercover officers were well-aware that Henderson went by the nickname

of "Shawn:"

> Q.    And did any particular individual come to the focus as a result of these
>        investigative techniques?
> A.    Carl Henderson, and his nicknames were S-Dot and Shawn.

Trial Tr. at 10 (Mar. 16, 2007).  *See also id.* at 55 (Lucas knew "[t]hat some other drug traffickers

called him Shawn.").  *And see* Doc. 72-2 at 9 ("On July 24, 2006, CS-4 was interviewed . . . he and

CS-3 were regularly purchasing sixteen ounce quantities of PCP from a black male from Los

Angeles who they knew as 'Sean' CS-4 further advised that 'Sean' was married to Tekora

Madden").

Continuing, by citing to Cleveland's traffic code, the Government tries to argue that Madden

was "arrestable" for having failed to report her husband's crime of presenting false identification.

Obvious problems exist with this argument.  First, no record evidence suggests that Madden knew

that the identification presented by Henderson was false.  Second, regardless of Madden's

knowledge of Henderson's identification papers, Ohio's misprison statute only obligates a person

to report felonies and, further, exempts spouses from reporting each other.  *See* OHIO REV. CODE

ANN. § 2921.22(A), (G).

If at all, Henderson violated Cleveland's Codified Ordinance No. 435.04 at the point when

he displayed or possessed "any identification card . . . knowing the same to be fictitious;" or

"[d]isplay[ed] or represent as one's own, any identification card . . . not issued to the person so

displaying the same."  Nothing suggests that Madden knew, advised or incited Henderson to make

such a false representation.  Madden refused to provide police with Henderson's surname.

Independent of the protection that Ohio law provides an individual who declines to answer an

-20-

Case No. 1:07-CR-68
Gwin, J.

officer's question, Madden's refusal to provide Henderson's surname had no consequence given that

Special Agent Lucas and Detective Clark already knew "Shawn" to be "Carl Henderson."

Thus, the undercover officers did not have probable cause to arrest Madden for aiding or

abetting Henderson's use of false identification at the roadside stop.  Cleveland's traffic code does

not reach Madden's statements at the roadside stop; Ohio law does not require an individual to

provide identification information of another; and, the State's misprison statute deals with felonies,

not misdemeanors, and, at any rate, explicitly excuses wives from reporting the crimes of their

husbands.  As a result, the Government's characterization of Madden as "arrestable" for aiding or

abetting Henderson's provision of his false identification to the police at the roadside stop fails.

In addition to rejecting the Government's attempted argument that Madden "was arrestable,"

the Court notes that the undercover officers' excuses for seizing Madden had no relation with their

actual purpose in detaining her.  Testimony at the suppression hearing made this clear.  Rather than

take her into custody for aiding and abetting Henderson's false identification, Lucas, Heffernan, and

Clark detained Madden to investigate a PCP-related crime that they thought might be taking place

or could take place in the future.  The officers did not have any knowledge of Madden's

participation in any current or imminent drug deal.  Nevertheless, Lucas told Heffernan to "detain

her" at the roadside stop and the undercover team would "go from there."  *See* Trial Tr. at 21 (Mar.

16, 2007).  As Special Agent Lucas testified at the suppression hearing:

> I told [Heffernan], I'm on this other surveillance [of Lewis and Taylor], do what you
> have to do; find out, investigate, do what you can do; find out what's going on;
> obviously, seize the money.  We're going to tow the car, search the car.  See if
> there's any other contraband in the car.

*Id.* at 19-20.  Lucas instructed Heffernan and Clark to interrogate Madden "to figure everything out,

further investigate" any information that she might have about Henderson and the PCP ring. *Id.* at

-21-

Case No. 1:07-CR-68
Gwin, J.

306. Lucas's "plan was that [the investigating police] should eventually end up out at the [Extended Stay America] hotel room and do a search warrant, and end up doing a search warrant at [Madden's] residence." *Id.* at 21.  Thus, the undercover officers did not have probable cause that Madden had committed, was committing, or was about to commit an offense.  *See DiFillippo*, 443 U.S. at 37. Nevertheless, they seized Madden to obtain from her any information that could further their on-going PCP investigation.

To justify the officers' actions, the Government attempts to use as precedent *United States v. Dede*, 83 Fed. Appx. 732 (6th Cir. 2003).  This attempt fails.  First, *Dede* is an unreported decision.  Second, *Dede*'s facts differ materially from those in the instant case.  For example, in *Dede*, the Task Force agents not only had probable cause that the travelers from California had presented false identification, but – based on their observation of the Californian's dress, luggage, and behavior – the agents also had separate, independent probable cause to believe that the Californians presently trafficked in drugs.  *See, e.g.*, 83 Fed. Appx. at 734-35.  Based on this independent probable cause, the agents sought and obtained search warrants for the travelers' persons.  *Id.* at 735.  When the agents searched the travelers, they found that the men "had one-kilogram bricks of cocaine strapped to each thigh."  *Id.*  Thus, probable cause to search the men for drug trafficking resulted from criminal activity actually underway at the time of the arrest.

In the instant case, the undercover officers did not possess an independent *Dede*-type probable cause or any other "knowledge, facts, and circumstances" sufficient to warn them of Madden's role in a past, present, or future crime.  Instead, Heffernan and Clark took her into custody at the roadside stop and, upon Lucas's orders, tried to "find out, investigate, . . . find out what's going on . . . " as they traveled to the Fourth District Station and then the Justice Center.  At the

-22-

Case No. 1:07-CR-68
Gwin, J.

Justice Center, Special Agent Lucas and the other officers convinced Madden to agree to a search of the Wynde Tree Residence. Only upon completing the search did the police obtain the probable cause needed to "formally" arrest Madden, i.e., the bottle of PCP-laden Listerine, two bricks of marijuana, cash, and other possessions. Thus, the facts in the instant case differ widely from those in *Dede*.

"[A]t some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments." *Hayes v. Fla.*, 470 U.S. 811, 815-16 (1985). Police cross the line between an investigatory detention and a full-fledged arrest when they, "without probable cause or a warrant, forcibly remove a person from . . . [any] place in which he is entitled to be and transport him to the police station, where he is detained . . . for investigative purposes." *Hayes*, 470 U.S. at 816.

This reflects the chain of events imposed on Madden by Lucas, Heffernan, and Clark on January 11, 2007. Because the undercover officers did not carefully tailor the scope of Madden's detention to its underlying justification, they violated her Fourth Amendment rights by seizing her at the scene of the roadside stop without probable cause and transporting her to the Fourth District Station and the Justice Center.

Accordingly, the Court finds that Madden's seizure does not qualify as a narrowly defined intrusion permitted by the Fourth Amendment's jurisprudence. *See Terry v. Ohio*, 392 U.S. 1 (1968). "While the line between a reasonable *Terry* 'stop' and *de facto* arrest is often unclear, it is quite apparent that there is no such thing as a *Terry* 'transportation.'" *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 591 (6th Cir. 1994). Rather, the removal of a suspect from the scene of the

-23-

Case No. 1:07-CR-68
Gwin, J.

stop generally marks the point at which the Fourth Amendment demands probable cause. *See, e.g.*, *United States v. Sharpe*, 470 U.S. 675, 692 n.2 (1985) (Marshall, J., concurring) (noting that "[a] stop can also be unduly intrusive if the individual is moved or asked to move more than a short distance . . ."); *Royer*, 460 U.S. at 502-03 (plurality opinion) (finding that stop converted to arrest when officers moved detainee from concourse to small room during airport stop); *United States v. Martinez*, 808 F.2d 1050, 1055 (5th Cir.) (holding that stop converted to arrest when police transported passengers to station after finding drugs in car), *cert. denied*, 481 U.S. 1032 (1987).

Here, the undercover officers exceeded *Terry*'s ambit by extending Madden's initial roadside stop into an afternoon in the back seat of Captain Heffernan's police car and evening in the interrogation room at the Justice Center. Thus, Madden's seizure at the roadside stop was an arrest without probable cause and, therefore, violated her Fourth Amendment rights.

C. Taint of Madden's Illegal Seizure

Evidence obtained from a search may be inadmissible if the consent to search was obtained from an individual seized in violation of his or her Fourth Amendment rights. *United States v. Lopez-Arias*, 344 F.3d 623, 628-29 (6th Cir. 2003). When an individual consents to a search subsequent to an illegal seizure, a court must exclude the evidence unless "the consent is sufficiently attenuated from the illegal seizure such that the consent is an intervening act of free will." *Id.* at 629.

As discussed above, the record supports the Court's finding that the police arrested Madden without probable cause following the January 11, 2007 roadside stop. Consequently, the Court will not allow the Government to present evidence gathered after Captain Heffernan put Madden in the back seat of his police car. As a result, the Court grants Madden's motion to suppress evidence

-24-

Case No. 1:07-CR-68
Gwin, J.

obtained after the undercover agents arrested her at the scene of the roadside stop.

### III.  Conclusion

For these reasons, the Court **DENIES** Madden's motion to suppress as it relates to evidence seized from the green minivan following the January 11, 2007 roadside stop; the Court **GRANTS** Madden's motion to suppress as it relates to evidence seized and statements obtained after the undercover officers arrested Madden at the January 11, 2007 roadside stop.

IT IS SO ORDERED.


Dated: April 13, 2007                                    s/          *James S. Gwin*
                                                         JAMES S. GWIN
                                                         UNITED STATES DISTRICT JUDGE